**Alan D. HARRIS, as Executor of the Estate of Raymond DeJongh, Deceased, Plaintiff,**

v.

**VAO INTOURIST, MOSCOW: Intourist, New York: National Hotel: and the Union of Soviet Socialist Republics, Defendants.**

**No. 78 Civ. 2352 (JBW).**

United States District Court, E. D. New York.

Nov. 9, 1979.

Alan K. Hirschhorn, Roslyn Heights, N. Y., for plaintiff.

Wolf, Popper, Ross, Wolf & Jones, New York City, for defendants; Michael P. Fuchs, New York City, of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Raymond DeJongh, an American tourist, died as a result of a fire in the Moscow National Hotel where he was a guest. Alleging that "one or more of the defendants owned, leased, operated, managed, maintained and controlled" the National Hotel negligently, plaintiff's testator seeks damages.

Defendants move to dismiss on the ground that this court lacks jurisdiction. Each defendant seeks protection as a unit of a "foreign state" under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq.

The motion must be granted. Under the terms of the Immunities Act, each of the defendants qualifies for immunity as "an agency or instrumentality of a foreign state." Because of the Act, an American traveler abroad injured by the negligence of a state-owned "commercial" instrumentality has less protection from American courts than he would have were he similarly injured by a privately owned enterprise. Whether appropriate remedies are available in the foreign jurisdiction—as they will be in many situations—is not an issue relevant under the Act and we do not address it.

## I. FACTS

All Union Company for Foreign Travel (Intourist, Moscow), is a legal entity established by decree of the Union of Soviet Socialist Republics Council of Labor and Defense and by statute. The Intourist Statute, Article 10, provides that the shares of Intourist may be owned only by Soviet organs or instrumentalities; 51% of the stock is owned by the State Administration for Foreign Tourism, 20% by the All-Union Organization, "Mezhdunarondnaya," and 29% by the Union of Soviet Socialist Republics Chamber of Commerce.

Intourist, Moscow is vested with authority to establish hotels. The defendant National Hotel was created pursuant to this authority as a separate legal entity authorized to operate and maintain a state-owned hotel in Moscow. All of its assets are in Moscow, where the hotel is registered as a legal person; the hotel conducts no activities in the United States.

VAO Intourist in the United States of America, New York (Intourist, New York), was created in Moscow pursuant to Article 4 of the Intourist Statute. Like Intourist, Moscow, it is state-owned. Its purpose is to promote tours from the United States to the Union of Soviet Socialist Republics. For this purpose it maintains offices and conducts a substantial business in New York City, encouraging use of Intourist,

Moscow's facilities, including hotels in Moscow. Whether it is a separate entity for purposes of the Immunities Act, as plaintiff alleges, or a part of Intourist, Moscow, incapable of being sued as an independent organization, as defendants assert, is, as will appear below, of no significance under the facts of this case.

When visitors from the United States seek accommodations in Russia, they do so through private United States travel agencies which place orders with Intourist, Moscow. Intourist, Moscow confirms the arrangements with the American private agencies; they, in turn, advise the travelers. In the case at bar, a private travel service located in New York City arranged with Intourist, Moscow for decedent's accommodations at the National Hotel.

## II. LAW

### A. *Foreign States and Waiver of Immunity*

Absent a showing that one of the exceptions to the Immunities Act applies, each of the defendants qualifies for immunity as a "foreign state or as an agency or instrumentality of a foreign state" under the Act. Section 1603 of title 28 provides that:

(a) A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a state of the United States . . . nor created under the laws of any third country.

Title 28, U.S.C. §§ 1602 *et seq.*, precludes actions against agencies or instrumentalities of foreign states, except as provided in

the Act. Plaintiff claims that the defendants have waived this immunity or, alternatively, that the activities of the defendants cause them to be excluded, pursuant to section 1605(a)(2), from the Act's protection.

The legislative history suggests that implied waivers by commercial action are not consonant with the Act's purposes; implicit waivers are reflected in actions relating to adjudication and explicit waivers are found in treaties. The report on the Act states:

Section 1605(a)(1) [of title 28] treats explicit and implied waivers by foreign states of sovereign immunity. With respect to explicit waivers, a foreign state may renounce its immunity by treaty, as has been done by the United States with respect to commercial and other activities in a series of treaties of friendship, commerce, and navigation, or a foreign state may waive its immunity in a contract with a private party. Since the sovereign immunity of a political subdivision, agency or instrumentality of a foreign state derives from the foreign state itself, the foreign state may waive the immunity of its political subdivisions, agencies or instrumentalities.

With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.

H.R.Rep. No. 94–1487, 94th Congress, 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6617.

There is no evidence that there was either an explicit or implicit waiver of immunity. A letter of the Soviet Ambassador, claiming immunity for each defendant, "has a persuasive quality." *Yessenin-Volpin v. Novosti Press Agency, Tass,* 443 F.Supp. 849, 854 (S.D.N.Y.1978). The statutes and treaties cited by plaintiff, though indicating a capacity of the defendants to sue or be

sued at their option, do not reflect an intention to waive governmental immunity.

### B. *Jurisdictional Basis—Continuing and Systematic Contacts*

There would be enough activity of Union of Soviet Socialist Republics' integrated tourism activities within the United States to provide a basis for due process-in-personam jurisdiction under *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The various tourist services of the Union of Soviet Socialist Republics operating cooperatively transact sufficient continuous business within New York to meet the requirements of statutes such as that state's section 301 of the Civil Practice Law and Rules. It provides: "A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." Pursuant to this provision the courts approve in personam jurisdiction based upon continuing presence through continuing business contacts under factual circumstances similar to those present here. *See, e. g., Gelfand v. Tanner Motor Tours Ltd.*, 339 F.2d 317 (2d Cir. 1964), *on remand,* 385 F.2d 116 (2nd Cir. 1967); *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967); *Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965). *Cf., e. g., Cornelison v. Chaney*, 16 Cal.3d 143, 127 Cal.Rptr. 352, 545 P.2d 264 (1976) (Nebraska resident present in California because twenty trips a year into California provide basis for "doing business" jurisdiction; California resident struck in Nevada).

It is important to note that under this "doing business" concept—which is a form of presence—the cause of action sued upon does not have to arise out of activities in, or other contacts with, the local jurisdiction. For purposes of in personam jurisdiction, the foreign entity is treated as a local domiciliary. Were the defendants private corporations organized abroad, in personam jurisdiction would lie under a statutory scheme such as New York's since they have sufficient continuing commercial operations and contacts with New York to be "doing business" here—i. e., present in the same sense as New York domestic corporation—for jurisdictional purposes.

The question is whether a different result from the traditional one must be reached because the defendants are foreign-state owned enterprises. The answer is yes. This result is required because Congress has adopted a special jurisdictional statute covering entities owned by foreign states; it has authorized the exercise of less than the complete personal jurisdiction that might constitutionally be afforded American courts under traditional concepts of fairness and due process. The variety of state bases for jurisdiction are not available because Congress created a uniform jurisdictional statute applicable throughout the United States. Moreover, due to the policy and language of the Immunities Act, the Act's bases of jurisdiction are less comprehensive than those found in the usual jurisdictional statutes of the states and the District of Columbia.

As demonstrated in II C, *infra*, Congress did not incorporate into the Immunities Act an in personam basis predicated upon presence or, as it is referred to in the District of Columbia Court Reform Act, an "enduring relationship." (As discussed below, reference is made to the provisions in the District of Columbia because the Immunities Act was patterned after the District's statute.) That provision of the jurisdiction statute of the District—equivalent to New York Civil Practice Law and Rules § 301 (but narrower in effect)—reads as follows:

§ 13–422. Personal jurisdiction based upon enduring relationship

A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief.

It is significant that like section 1.02 of the Uniform Interstate and International Procedure Act, and unlike such provisions

as New York's Civil Practice Law and Rules section 301, as interpreted, a foreign entity is not present merely because it is continuously "doing business" in the District. It must be organized under the laws of, or have its principal place of business in, the District. Thus, even if the legislative history of the Immunities Act and its language were stretched to encompass District of Columbia section 13–422, the defendants Intourist Moscow and National Hotel would not have an enduring relationship sufficient to provide an in personam basis for jurisdiction. Intourist, New York, assuming it is a separate entity for purposes of the Act, has its principal place of business in New York and, therefore, does have such a relationship; but it is not its activities but those of the National Hotel that are the gravamen of the action. Only if a broad "doing business" concept such as that found in New York's Civil Practice Law and Rules section 301 were in effect could the activities in New York of Intourist New York provide the predicate for in personam jurisdiction over Intourist Moscow and the National Hotel.

Under the New York provision, the relationship among Intourist, New York, Intourist, Moscow and the National Hotel would be significant. If its actions are integrated with or essential to the operations of a principal or parent corporation, an agent's or subsidiary's contacts with a forum can provide a basis for jurisdiction over the principal or parent. *See Gelfand v. Turner Motors Tours Ltd.*, 339 F.2d 317 (2d Cir. 1964), *on remand*, 385 F.2d 116 (2nd Cir. 1967). As noted in II C, *infra*, because of the absence of a "doing business" provision similar to section 301 of New York's Civil Practice Law and Rules in the Immunities Act, the essential factual issue is not the degree of oblique contacts of the National Hotel with the United States, but rather whether the allegedly negligent activity of the National Hotel had a "direct effect" in the United States. Systematic and continuous contacts with the United States do not provide the grounds for finding an exception to the Immunities Act and a basis of jurisdiction.

### C. Jurisdictional Basis—Contact Linked to The Claim for Relief

Although the waiver provision, as a rough analogy to consent, apparently incorporates that traditional basis of jurisdiction, the draftsmen of the Immunities Act concentrated on the bases incorporated in the newer forms of long-arm jurisdiction. These modern long-arm statutes require a link between the "contact" with the local jurisdiction which is the basis for in personam jurisdiction in the suit and the facts upon which the particular cause of action—in federal parlance the claim for relief—is based. *See, e. g., Gray v. American Radiator & Standard Sanitary Corporation*, 22 Ill.2d 432, 176 N.E.2d 761 (1961); W. L. M. Reese, Summary of State Statutes, 1959 N.Y.L.Rev.Com.Rep. 69, 131 (1959); Uniform Interstate and International Procedure Act, § 1.02, Personal Jurisdiction Based Upon Enduring Relationship, 9B Uniform Laws Annot. 308 ff. (1966) (Commissioners' Note); W. L. M. Reese, Report of the Administrative Board of the Judicial Conference of New York 132 (1966); *compare* Restatement (Second) of the Law of Conflicts § 35, Doing Business in State (1971) *with id.* § 36, Doing an Act in State, *and id.* § 37, Causing Effects in State by Act Done Elsewhere; Comments and Reporter's Notes to *id.* §§ 36, 37; W. L. M. Reese and M. Rosenberg, Cases and Materials on Conflict of Laws, 63 ff. (7th ed. 1978); 4 C. Wright and A. Miller, Federal Practice and Procedure ¶ 1068 (1969).

While the reach of long-arm statutes extends further than those of traditional presence provisions, their grasp is not as encompassing. The relation between the requisite contacts and the claim for relief shifts depending on the particular basis for long-arm jurisdiction. Thus, when the basis of jurisdiction is the "transaction" of business—a long arm concept—in the state, a close connection is required. *See, e. g.,* Uniform Interstate and International Procedure Act, § 1.03, Personal Jurisdiction Based Upon Conduct, 9B Uniform Laws Annot., 310 ff. (1966) (Commissioners'

Note). When jurisdiction results from a non-resident's activity outside the state which causes tortious injury in the state, the nexus between contacts and the claim for relief need not be so close, but there must be a link.

Section 1605(a) of title 28, as enacted by the Immunities Act, provides that certain activities will be excepted from the Act's grant of immunity. This provision is, in essence, an explanation of when the district court may exercise in personam jurisdiction over a foreign state. It describes three "commercial" situations in which immunity is not available:

§ 1605. General exceptions to the jurisdictional immunity of a foreign state.

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case

. . . . .

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The first clause of section 1605(a)(2) focuses upon actions arising from commercial activity within the United States. This is essentially a clause which deals with the transaction of individual business deals in the United States. It is not equivalent to the "doing business" provisions described in II B, *supra*. The clause requires that the court action "be based upon" the specific commercial activity carried on in the United States. It resembles the "transaction" of business clauses used in many of the long-arm provisions. *See, e. g.*, Uniform Interstate and International Procedure Act § 1.03(1), 9B Uniform Laws Annot. 310 (1966). The commercial activity out of which plaintiff's claim arises is the operation of the Hotel in Moscow; despite the apparent integration of the Soviet tourist industry, the relationship between the negligent operation of the National Hotel and any activity in the United States is so attenuated that this clause is not applicable. Even though defendants "may be 'doing business' here in the *traditional sense,*" *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (1967) (emphasis in original), *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967), there is no "doing business" provision in the Act. This civil court action is not based upon commercial activity in the United States.

The second clause in section 1605(a)(2) deals with actions arising from acts performed in the United States. Because the allegedly negligent act—unsafe operation of the hotel—took place in the Union of Soviet Socialist Republics, the second clause does not apply.

The third clause in this section of the Act addresses commercial acts outside the United States with a "direct effect" within the United States. While arguably on point, analysis of the history and language of the Act demonstrates that it is not applicable.

The legislative history of the Immunities Act indicates that it was patterned after the long-arm statute enacted by Congress for the District of Columbia. *See* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin. News pp. 6604, 6612. Though the focus of this portion of the legislative history is on amendments to section 1330 of title 28, which addresses the jurisdiction of the district courts over foreign states, section 1330 and section 1605 are "carefully interconnected." *Id.* at 6612. In interpreting section 1605, therefore, courts properly look to the interpretations given the District of Columbia long-arm provisions. *See, e.g., Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978).

Drawing assistance from the District of Columbia statutory scheme is difficult since the structure and language of section 1605 does not resemble that of the District of Columbia's jurisdiction provisions. This

problem exists because the Immunities Act incorporates in the same provisions answers to three issues: (1) when to grant immunity, i. e., making the distinction between commercial and governmental activity; (2) what is the basis for long-arm in personam jurisdiction (a question handled with great sophistication and specificity in the Uniform Interstate and International Procedure Act, various state statutes and in the District of Columbia statute); and (3) how great is the scope of subject matter jurisdiction. The effect of this construction is to conceal distinctions that need to be drawn in careful analysis.

One thing is clear from the specific language of the legislative references to both the District of Columbia provision and the Uniform Interstate and International Procedure Act, and that is a long-arm statute was in the mind of congressional draftsmen. *See* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, *reprinted in,* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6617. The long-arm provision of the District of Columbia relied upon by Congress is typical of many state provisions. It provides in pertinent part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to *a claim for relief from the person's—*
>
> (1) transacting any business in the District of Columbia;
>
> (2) contracting to supply services in the District of Columbia;
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
>
> (4) *causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia* ;
>
> (5) having an interest in, using, or possessing real property in the District of Columbia; or

> (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing.

13 D.C.Code § 13–423 (1973) (emphasis supplied). The specific activity described in clauses (1) to (6) must give rise to the "claim for relief." It is thus different, as already noted, from the traditional "doing business" presence basis where the activity giving rise to the claim for relief need not arise from the contacts within the local jurisdiction. The "direct effect" requirement in the third clause of section 1605(a)(2), like the tortious injury requirements of the District of Columbia long-arm section, exists to partially satisfy the requirement that a non-resident have sufficient contacts with the forum before its courts can exercise in personam jurisdiction.

Obviously the negligent operation of a hotel in Moscow causing the death of a United States resident has effects in the United States; here it leaves aggrieved relatives in this country. But the precise issue is not whether the fire had any effect here, but whether it had a "direct effect" in the United States within the meaning of the statutory language. Indirect injurious consequences within this country of an out-of-state act are not sufficient contacts to satisfy the "direct effect" requirement of section 1605(a)(2).

Congress explained that the third clause of section 1605(a)(2) embraces "commercial conduct abroad having direct effects within the United States which would subject such conduct to the exercise of jurisdiction by the United States consistent with principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Laws of the United States (1965)" H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6618. The reference to section 18 of the Restatement (Second) of the Foreign Relations Laws of the United States suggests that the term "direct effect" requires

a substantial impact in this country that is a directly foreseeable result of the negligent act outside the country; it is essentially a long-arm provision and reads:

§ 18. Jurisdiction to Prescribe With Respect to Effect Within Territory.

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either

(a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

(b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) *it occurs as a direct and foreseeable result of the conduct outside the territory*; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

Restatement (Second) of the Foreign Relations Laws of the United States § 18 (1965) (emphasis supplied). It is possible, of course, to argue that "direct effect" is derived from the less restrictive concept of "effect" as it appears in section 18(a) of the Restatement. Since the conduct in the present case, i. e., negligence, is a widely recognized tort, section 18(a) could have been made applicable. The use by Congress of the adjective "direct" before "effect" points, however, to section 18(b) which is itself more restrictive. Thus, as derived from section 18 of the Restatement (Second) of the Foreign Relations Laws of the United States, direct effect refers to an effect which is both substantial and the direct and foreseeable result of conduct outside the jurisdiction.

The legislative history of the Immunities Act suggests that further guidance may be provided by the District of Columbia's long-arm statute. *See* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604,

6612. The District of Columbia provision was itself formulated to reflect essentially the same long-arm jurisdiction as that which is exercised by Maryland and Virginia. *See* H.R.Rep. No. 907, 91st Cong., 2d Sess. 61 (1970); *Margoles v. Johns,* 157 U.S. App.D.C. 209, 214–15, 483 F.2d 1212, 1217–18 (D.C.C.1973). Neither the Maryland nor Virginia provisions use the term "direct effect," but like the District provision, they are long-arm statutes of "moderate reach." 4 C. Wright and A. Miller, Federal Practice and Procedure § 1068, p. 247, n. 43 (1969). *See* Code of Virginia, Title 8.01 Civil Remedies and Procedures § 8.01–328.1 (1977); Md.Code Ann., Courts and Judicial Proceedings § 6–103 (1974); 13 D.C.Code § 13–423 (1973).

Ascertaining the meaning of "direct effect" and the interpretation of section 1605(a)(2) are difficult because the jurisdictional statutes on which section 1605(a)(2) was patterned are, as a comparison of the Act and relevant statutes show, quite different in approach. Although they focus on the contacts of the non-resident, the Virginia, Maryland and District of Columbia statutes, in effect, make distinctions based on traditional classifications of causes of action such as "commercial"—e.g., contract—and "tort"—e. g., negligence, products liability and libel. *See* Note, The Virginia "Long Arm" Statute, 51 Virginia L.Rev. 719, 732 (1965).

In contrast, the Foreign Sovereign Immunities Act is grounded in the history of the State Department's attempts to regularize our courts' treatment of foreign state agencies. The basic distinction is between "governmental" and "commercial" activity. *See* "Tate Letter" to Acting Attorney General Perlman, 26 Dept.State 984 (1954). The "immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)." H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6605. *See generally,* describing and approving the Act, von Mehren, The Foreign Sov-

ereign Immunities Act of 1976, 17 Colum.J. Trans.L.J. 429 (1977); Simmons, The Foreign Sovereign Immunities Act of 1976: Giving the Plaintiff His Day in Court, 46 Fordham L.Rev. 543 (1977); Delaume, Three Perspectives on Sovereign Immunity, 71 A.J.I.L. 379 (1977); Timberg, Sovereign Immunity and Act of State Defenses: Transnational Boycotts and Economic Coercion, 55 Tex.L.Rev. 1, 13–20 (1976); Peay, The Foreign Sovereign Immunities Act of 1975: Reflections on Old Problems in a New Bill, 5 Black L.J. 270 (1976); Note, Sovereign Immunity, 18 Harv.Int'l L.J. 429 (1977). For a generally critical analytical breakdown of the Act's various components see L. Henkin, R. C. Pugh, O. Schacter and H. Smit, International Law, passim (2d ed. 1979).

As it is used in section 1605(a)(2), "commercial activity" is meant to distinguish activity which results from what in our society would be termed governmental, public or sovereign enterprises—e. g., running police departments or parks—from those resulting from the acts of foreign state agencies or instrumentalities acting in what we would deem a commercial capacity —e. g., operating hotels or cruise ships. See Yessenin-Volpin v. Novosti Press Agency, Tass, 443 F.Supp. 849 (S.D.N.Y.1978).

Thus, because of the structure and history of the Immunities Act, it does not reflect the same classifications used by the District of Columbia and similar long-arm statutes. Included in the concept of "commercial activity," as used in the third cause of section 1605(a)(2), are actions which would be characterized as contractual or tortious arising from the "commercial" governmental activities of foreign state-owned entities. The third clause of section 1605(a)(2) encompasses tortious acts outside the United States related to commercial activity (as opposed to governmental activity), having direct effects in the United States.

This interpretation and the legislative history already adverted to would suggest that section 13–423(a)(4) of the District of Columbia statute dealing with tortious acts or omissions outside the District causing tortious injury within the District provides the strongest analogy to the direct effect clause of section 1605(a)(2) in a factual situation such as the one before us. The "tortious injury" provision of the long-arm statute of the District of Columbia as well as that of Virginia and Maryland, have been interpreted as more restrictive than the provisions of some other states. Margoles v. Johns, 157 U.S.App.D.C. 209, 211, 483 F.2d 1212, 1214 (D.C.C.1973). These provisions are modeled after the Uniform Interstate and International Procedure Act. See John G. Kolbe, Inc. v. Chromodern Chair Co., 211 Va. 736, 180 S.E.2d 664, 667 (1971); Carter v. Massey, 436 F.Supp. 29, 32 (D.Md. 1977); Uniform Interstate and International Procedure Act § 1.03, 9B Uniform Laws Annot. 310, 312 (1966) (Commissioners' Note). Cognizant of this restrictive view, courts in Maryland, Virginia and the District of Columbia have rejected jurisdiction when the only contact in the forum is an injurious consequence of an out-of-state act or omission. See, e. g., Margoles v. Johns, 157 U.S.App.D.C. 209, 483 F.2d 1212 (D.C.C. 1973) (in libel action, mere presence of news-gathering office in the District was insufficient basis for personal jurisdiction); Haynes v. James H. Carr, Inc., 427 F.2d 700, 703–704 (4th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970) (interpreting Virginia law); Beaty v. M. S. Steel Co., 401 F.2d 157, 159 (4th Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969) (interpreting Maryland law and explaining that Maryland law is "[m]odeled upon, but more restrictive than, the Uniform Act"); Danville Plywood Corp. v. Plain and Fancy Kitchens, Inc., 218 Va. 533, 238 S.E.2d 801 (1977).

Even were the District of Columbia long-arm statute broader in its coverage, it is doubtful that it would cover the situation before us. The injured-tourist line of cases have consistently rejected the long-arm basis of in personam jurisdiction. See, e. g., Oddi v. Mariner-Denver, Inc., 461 F.Supp. 306 (S.D.Ind.1978) (both long-arm and presence bases rejected on facts); Wilson v. Holiday Inn Curacao N. V., 322 F.Supp. 1052 (D.Mass.1971); Scheidt v. Young, 389

F.2d 58 (3d Cir. 1968) (per curiam); *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 535, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, 852, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967); *Gelfand v. Tanner Motor Tours, Ltd.,* 339 F.2d 317 (2d Cir. 1964), *on remand,* 385 F.2d 116 (2nd Cir. 1967).

Despite all this legislative history and statutory and case law, the concept of "direct effect" remains elusive. But, when traced through the more restrictive view applied to relevant long-arm provisions of the District of Columbia, Virginia, Maryland and the Uniform Act, it is reasonable to hold that section 1605(a)(2) of title 28, adopted as part of the Immunities Act, was designed to restrict the exercise of the potential jurisdictional power of American courts to tortious activities outside this country which have a "substantial" impact in the United States. *See Note,* Sovereign Immunity, 18 Harv.International L.J. 429, 437–440 (1977) (suggesting that "direct effect" should reflect an impact greater than that required to find an effect under the Commerce Clause of the Constitution).

This conclusion is confirmed by *Upton v. Empire of Iran,* 459 F.Supp. 264 (D.D.C. 1978)—a case presenting facts similar to those in the present case. In *Upton,* the plaintiffs commenced a negligence action for personal injuries caused by the collapse of an Iranian airport building roof. The court noted that the defendants were clearly within the scope of the Foreign Sovereign Immunities Act and had been properly served. Thus, the only issue in *Upton* was whether the occurrence in Iran had a "direct effect in the United States." Reviewing the legislative history of section 1605(a)(2), the court found that suffering pain within the United States as a consequence of an injury outside the jurisdiction was insufficient to invoke jurisdiction. *Cf. also East Europe Domestic Internal Sales Corp. v. Terra,* 467 F.Supp. 383 (S.D.N.Y. 1979) (suit against Romanian trading company for interference with contract—no jurisdiction); *Carey v. National Oil Corp.,* 453 F.Supp. 1097 (S.D.N.Y.1978), *aff'd,* 592 F.2d 673 (2d Cir. 1979) (Libyan oil company

in suit by Bahamian subsidiary of New York corporation—no jurisdiction); *but cf. National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 637–39 (S.D. N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir. 1979) (New York letter of credit payable through New York banks where beneficiary was a New York corporation met requirements of "direct effect"); *Yessenin-Volpin v. Novosti Press Agency, Tass,* 443 F.Supp. 849, 855 (S.D.N.Y.1978) (suggests that injury in the United States to good name and reputation is a direct effect).

The case before us is clearer than *Upton.* For here death occurred in Moscow. There was no suffering of the injured person in this country and our health care facilities were not utilized.

## III. CONCLUSION

The protection offered United States citizens by American courts is restricted by the "direct effect" requirement of the Immunities Act. Had Congress wished to provide broader protection it could have omitted the word "direct", requiring instead only the degree of effect necessary to satisfy due process requirements. Alternatively, it could have utilized a broad "doing business" presence concept in the traditional sense such as that incorporated in section 301 of the New York Civil Practice Law and Rules.

The insuperable problem faced by the plaintiff arises because of the Immunities Act's policy and its conflation of the doctrines of subject matter jurisdiction, in personam jurisdiction and sovereign immunity. Despite the rule that "[s]overeign immunity is a derogation from the normal exercise of jurisdiction by the courts and should be accorded only in clear cases," *Victory Transport, Inc. v. Comisaria General,* 336 F.2d 354, 360 (2d Cir. 1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), Congress has given the courts little room to maneuver in a case such as the one now before us. Any statutory interpretation which reached a contrary result would constitute a distortion of the Act's language

and history. The sensitive and difficult problems presented by possible conflicts between private rights and international comity are, under our Constitution, peculiarly fitted for executive and legislative resolution. Responsibility for any change in the statutory balance lies with Congress, not the courts.

The action is dismissed. All the defendants are foreign states or instrumentalities not encompassed within any exception to the Immunities Act.

So ordered.