**AMPAC GROUP INC., Plaintiffs**

**v.**

**The REPUBLIC OF HONDURAS, the Ministry of the Treasury and Public Credit of the Republic of Honduras, Corporacion Nacional De Inversiones, an agency or instrumentality of the Republic of Honduras, Comision Negociadora Especial, an agency or instrumentality of the Republic of Honduras, and Benjamin Villanueva, Cesar Batres, Arturo Alvarado, Ramon Sarmiento, Arturo Morales Funez, Boris Zelaya Rubi, Arturo Venegas and Rene Bendana Martinez in their official capacities and against Benjamin Villanueva, individually and personally, Defendants.**

**No. 92–0382–CIV.**

United States District Court, S.D. Florida.

Aug. 5, 1992.

---

Rene A. Sotorrio, Miami, Fla., for plaintiffs.

Patricia M. Menendez, Patton, Boggs & Blow, Miami, Fla. and Steven M. Schneebaum and Benjamin G. Chew, Patton, Boggs & Blow, Washington, D.C., for defendants.

## ORDER DENYING MOTION TO DISMISS, AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Plaintiff has responded, and Defendant has filed a reply. For the reasons which follow, this Court will deny Defendants' Motion to Dismiss, and will deny without prejudice Defendant's Motion for Summary Judgment.

## I. BACKGROUND

This is a contract action. Plaintiff, a corporation whose principal place of business is Florida, entered into negotiations in 1989 with the Republic of Honduras, through its "agents or instrumentalities," for the purchase of an enterprise known as Cementos De Honduras, S.A. ("CEHSA"). CEHSA was offered for sale by Honduras' Corporacion Nacional de Inversiones ("CONADI"), a government corporation that owned approximately 51% of the outstanding capital stock of CEHSA. The sale was part of a program of privatization of previously state-owned industries.

Ampac submitted a bid for CEHSA on or about April 30, 1991. As the only bidder, Ampac was awarded the bid. Plaintiff alleges that CONADI thereafter transferred to itself certain assets of CEHSA, including shares of stock in other corporations, thereby reducing the value of CEHSA. CONADI allegedly failed to disclose this transfer. On June 25, 1991, the Republic of Honduras allegedly "bought out" several private creditors of CEHSA and took title to CEHSA in the name of the state, thereby making the approval of Honduras' Congress a prerequisite to the sale to Ampac. On July 10, 1991, the parties concluded an "Acta de Compromiso," which set out certain terms of the agreement for the sale of CEHSA. The legal significance of the July 10 document is disputed by the parties. Plaintiff contends that the "Acta" is a binding and enforceable contract of sale. Defendants, in turn, argue that the July 10 document is merely an agreement in principle, a "memorandum of intent." After the "Acta" was signed, Ampac allegedly tendered $2.7 million in Honduran foreign debt for CEHSA.

CEHSA was never transferred to Plaintiff. The Honduran Congress did not approve the sale, and nullified the bid solicitation process by which Ampac obtained the right to purchase CEHSA. Honduras is presently in the process of accepting new bids for the sale of CEHSA.

Defendants seek to dismiss on the grounds that (1) the Court lacks subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"); (2) The Act of State Doctrine precludes adjudication of Plaintiff's claims; (3) The Court lacks personal jurisdiction over the Defendants; and (4) venue does not properly lie in this Court. Defendants also have moved for summary judgment.

## II. MOTION TO DISMISS

### A. *The Foreign Sovereign Immunities Act*

█ Under the FSIA, a "foreign state shall be immune from the jurisdiction of

the courts of the United States" unless an exception to Act applies. 28 U.S.C. § 1604. A finding of immunity under the Act deprives the court of subject matter jurisdiction, and requires dismissal of the action. Plaintiff relies on the "commercial activities" exception to the FSIA. A foreign state is not immune from suit in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

Interpretation of the foregoing grant of immunity therefore turns on the definition of "commercial activity." That term is defined in the FSIA as follows:

> "[E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*.

28 U.S.C. § 1603(d) (emphasis added). By statute, the Court must focus on the *type* of transaction, rather than what entity is a party to it, or its ultimate objective.

Here, Defendants argue that privatizing a national cement industry is an action that could only be taken by a foreign sovereign, and is thus not "commercial activity." Privatization, Defendants argue, is merely the "flip side" of nationalization, a quintessentially sovereign prerogative. *See Baglab Ltd. v. Johnson Matthey Bankers Ltd.,* 665 F.Supp. 289, 294 (S.D.N.Y.1987). If nationalization is an activity that cannot be challenged in the courts of the United States, Defendants contend, so too is privatization.

This syllogism is flawed when considered against the FSIA's distinction between the nature and purpose of the transaction. The purpose of the transaction—devolution of a state-owned business as a part of a planned return to a market economy—is irrelevant to the inquiry. The sale of a company from its owners to the highest bidder is a routine commercial transaction.

The very recent Supreme Court decision of *Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), disposes of the issue.

In *Weltover,* foreign bond holders brought an action in the Southern District of New York against Argentina arising out of Argentina's unilateral rescheduling of the maturity dates for payment on its bonds. Argentina lacked sufficient foreign exchange to retire certain bonds, and issued a Presidential Decree extending the time for payment. The governmental action was part of an emergency currency stabilization plan.

A unanimous Supreme Court held Argentina's emergency measure to stabilize its own currency enjoyed no immunity in United States courts under the FSIA. In determining whether governmental conduct constitutes "commercial activity," the decision reaffirmed and clarified the distinction between the nature and purpose of the activity:

> the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, *the issue is whether the particular actions the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce."*

*Id.,* —— U.S. at ——, 112 S.Ct. at 2166 (emphasis added). After setting out the proper inquiry, the Court concluded that "it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." *Id.,* —— U.S. at ——, 112 S.Ct. at 2167.

Honduras' motivations are similarly irrelevant here. Engaging in a program of privatization does not automatically insulate Honduras from suit in the United States. The issue is whether Honduras' sale of property is a type of transaction by

which a private party engages in commerce.

Here, framing the question provides a clear answer. Accepting the allegations of the Complaint as true, a contract was executed between Ampac and the Republic of Honduras (and certain of its agents or instrumentalities) for the purchase of 50% of the shares of a company owned by CEHSA, and all of CEHSA's other assets. Compl. at ¶ 34. By commercial standards, such an agreement between corporations is routine and simple. It is the type of contract entered into by private parties that engage in commerce. Like the issuance of debt instruments by Argentina, "there is nothing about [the government's action] (except perhaps its purpose) that is not analogous to a private commercial transaction." *Weltover*, —— U.S. at ——, 112 S.Ct. at 2167.

■ Defendants' second challenge under the FSIA is similarly unavailing. Defendants contend that the activities alleged do not bear a significant nexus to the United States, as required by 28 U.S.C. § 1605(a)(2) (quoted above). The FSIA in relevant part provides no immunity for acts outside the United States "in connection with a commercial activity of the foreign state elsewhere" where those acts cause a "direct effect in the United States." *Id.*

■ Again, *Weltover* provides guidance. The Supreme Court rejected a suggestion in the legislative history of the FSIA that an effect is not "direct" unless it is both "substantial" and "foreseeable." *Weltover*, —— U.S. at ——, 112 S.Ct. at 2168. Rather, the Court held that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity." *Id.* (citations omitted). Plaintiffs in that case were all foreign corporations with no other connections to the United States. The Supreme Court held that the effect of Argentina's action was sufficiently "direct" where "money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id. Weltover* therefore teaches that the effect in the United States need only be slight. Although the effect cannot be speculative, the contact with the United States may indeed be only a tangential one to support jurisdiction under the FSIA.

The Complaint here alleges that "Defendants representations, breaches of contract and fraud caused AMPAC to expend substantial sums of money, incur substantial costs and charges, suffer injury to its business reputation and lose substantial profits in Miami, Southern District of Florida." Compl. at ¶ 67; Hansen Aff. Under the Supreme Court's recent interpretation of § 1605(a)(2), it is clear that these allegations, if true, would support jurisdiction under the FSIA. The harm alleged follows as an "immediate consequence" of Defendants' activities. *Weltover*, —— U.S. at ——, 112 S.Ct. at 2168; *see also Texas Trading & Milling Corp. v. Federal Rep. of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981) (because a corporation cannot be "crushed or burned" but only suffer a financial harm, "the relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss"), *cert. denied* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The fact that Ampac is an American corporation—with its primary operations in this country—bolsters this conclusion. *See Texas Trading*, 647 F.2d at 312.

The Court therefore has subject matter jurisdiction over this action.

### B. *The Act of State Doctrine*

■ The Restatement (Third) of Foreign Relations § 443(1) concludes that under the act of state doctrine, the courts of the United States "will generally refrain from ... sitting in judgment on other acts of a governmental character done by a foreign state within its own territory and applicable there." Recent decisions have tended to narrow the scope of the doctrine as expressed in the Restatement. *See Nelson v. Saudi Arabia*, 923 F.2d 1528, 1531–32 (11th Cir.1991) (reviewing recent application of doctrine). Indeed, the Supreme Court has increasingly restricted the doctrine, and recognized a shift in its theoretical underpinnings. In *W.S. Kirkpat-*

*rick v. Environmental Tectonics Corp.,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990), Justice Scalia, writing for a unanimous Court, noted that the doctrine once rested upon the "highest considerations of international comity and expediency;" yet, at present, it is more a "consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.,* 493 U.S. at 404, 110 S.Ct. at 704. While the first policy may retain some validity, the second has ascended to primary importance. Accordingly, the act of state doctrine either does not apply—or is at its weakest—for acts of state that consist of purely commercial transactions, and for cases in which no foreign policy goal of the Executive Branch is impeded. *Id.,* 493 U.S. at 403–05, 110 S.Ct. at 704.

 As discussed above, the underlying governmental action here is unquestionably commercial in nature. Further, Defendants do not argue that adjudication in this Court will interfere with any Executive objective. If the act of state doctrine even applies to this action,[1] no prudential reasons compel its invocation here. The Supreme Court has held that it is a doctrine to be applied sparingly, and only where the validity of a foreign sovereign is at issue. *Id.,* 493 U.S. at 409–10, 107 S.Ct. at 707; *Nelson,* 923 F.2d at 1531–32.

The Court finds that the act of state doctrine presents no obstacle to jurisdiction in the instant case.

### C. *Personal Jurisdiction and Venue*

Personal jurisdiction is both a statutory and constitutional matter.

The statutory analysis is straightforward. The FSIA sets out specific requirements for proper service of process on foreign state defendants. Title 28 U.S.C. § 1608(a) & (b) set out a hierarchy of authorized methods. Defendants allege noncompliance with these methods, stating that "the only notification of this suit Defendants received was from Plaintiff's counsel who 1) sent the Complaint and related papers to Honduran Consulate in Miami and 2) mailed the Complaint and related papers to Mr. Villanueva's home in Honduras. To date, none of the other Defendants has been served." Def.s' Mem. at 31. However, a review of the court file reveals that return receipts were returned to the Clerk of Court for the state defendants Mario Carias Zapata, head of the Ministry of Foreign Affairs, and for the state "agents or instrumentalities" CONADI, CNE, Benjamin Villanueva, and Arturo Morales Funez. *See Dock. Ent.* 5, 6, 17, & 29. Plaintiff states that Clerk of Court addressed and dispatched envelopes to each of these Defendants containing summonses, notices of suit, a Complaint, translated copies of each and a copy of the FSIA. It appears, therefore, that service was properly effected under §§ 1608(a)(3) & (b)(3)(B). In addition, service was effected on Mr. Villanueva in his personal capacity pursuant to the Federal Rules of Civil Procedure. Therefore, the Court concludes that the Court has personal jurisdiction over the Defendants named in the Complaint.[2]

 The constitutional dimensions of personal jurisdiction under the FSIA were recently examined in *Weltover,* — U.S. at ——, 112 S.Ct. at 2169. The Court assumed without deciding that a foreign state is a "person" for purposes of the Due Process Clause, and applied the "minimum contacts" test of *International Shoe Co. v.*

---

**1.** Arguably, this contract action does not require this Court to pass on the *validity* of any governmental act by a foreign sovereign. The main issue here is the existence *vel non* and precise terms of a contract for the sale of a corporation. Where the validity of acts by a foreign sovereign taken within its own jurisdiction is not in question, the doctrine has no application. *See W.S. Kirkpatrick,* 493 U.S. at 409–10, 110 S.Ct. at 707. The doctrine does not establish an exception for

cases that "may embarrass foreign governments." *Id.*

**2.** If service has not been properly effected, the FSIA allows for service by special arrangement with the Court. 28 U.S.C. § 1608(b)(3)(C). To the extent that any Defendant has not yet been effectively served, Plaintiff may submit a proposed Order to the Court on service.

*Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). *Id.*

The instant motion to dismiss for lack of personal jurisdiction should be denied "if plaintiff alleges sufficient facts to support a reasonable inference that defendant can be subjected to jurisdiction of the Court." *Jackam v. Hospital Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir.1986); *Bracewell v. Nicholson Air Services, Inc.*, 680 F.2d 103 (11th Cir.1982). During the preliminary stages of the litigation, in response to a motion pursuant to Fed. R.Civ.P. 12(b)(2), "Plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

Against this standard, the Court finds that the allegations contained in the Complaint are sufficient at present to withstand Defendants' challenge. The Complaint alleges the following facts:

1) the President of Honduras met with Ampac officials and attorneys in Miami, Florida. Compl. at ¶ 52.

2) Defendants have had "sustained and substantial" commercial contacts with Ampac in the United States on matters "directly related" to Ampac's purchase of CEHSA. Compl. at ¶ 56.

3) "The great bulk of defendants' contacts with AMPAC in the United States occurred in Miami, Southern District of Florida." Comp. at ¶ 57.

4) Defendants used the mail and telephone system to communicate with Ampac in Miami. Compl. at ¶ 58.

5) Honduran officials "held at least seven conferences" in the United States with Ampac executives to negotiate Ampac's acquisition of CEHSA. Compl. at ¶ 60.

6) Villanueva met with Ampac officials in Miami in January, February, and August of 1991 to negotiate Ampac's acquisition of CEHSA. Compl. at §§ 61 & 62.

7) Ampac's Vice President of Finance met with Villanueva in Miami in early September of 1991, and in Washington,

D.C. in late September of 1991. Compl. at §§ 63 & 64.

These contacts far exceed the slight contacts that supported personal jurisdiction in *Weltover*. In that case, the only relevant contacts the Republic of Argentina had with the United States is Argentina's issuance of debt instruments denominated in U.S. dollars, appointment of a general New York financial agent.

Plaintiff has substantiated its jurisdictional allegations with competent evidence. *See* Hansen Aff. The Court concludes that Plaintiff has plainly established a *prima facie* case of personal jurisdiction over the foreign state Defendants.

■ Defendants also contest venue. For purposes of the FSIA, a civil action against a foreign state may be brought in the United States District Court for the District of Columbia, or "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." 28 U.S.C. § 1391(f).

Venue is properly laid in this District. From the foregoing review of the Complaint, it is apparent that Defendants' contacts with the United States occurred predominantly in Miami, including some negotiation of the alleged contract that give rise to this action. Plaintiff's principal place of business is in Miami. Under § 1391(f), the subsection to the venue statute added by the FSIA of 1976, these factors are enough to lay venue in the Southern District of Florida. *See e.g., Translinear, Inc. v. Rep. of Haiti*, 538 F.Supp. 141 (D.D.C.1982) (venue proper either in District of Columbia, or Northern District of Texas, where Plaintiff's offices were located in Dallas, and Haitian officials met representative of plaintiff in Texas in connection with the transaction; *see also* 15 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3801.1 (FSIA venue statute's "in which claim arose" language "should be given the broader construction allowing a wider choice of forum").

### III. SUMMARY JUDGMENT

█ Defendants's motion for summary judgment is premature. First, genuine issues of material fact abound. The Complaint alleges several counts of fraud and misrepresentation, involving complex factual issues of intent and reliance. Indeed, the parties do not agree on the correct translation of the underlying "contract" in this case, much less on the facts surrounding its negotiation. Second, no party in this action has taken any discovery. Summary judgment is inappropriate where the party opposing the motion has not had an opportunity to conduct discovery. *See Alabama Farm Bureau Mut. Casualty Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602 (5th Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980).[3] The motion will therefore be denied with leave to renew following an adequate opportunity for discovery.

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment be and the same hereby is DENIED consistent with the Order. Accordingly, Defendants' request for oral argument is DENIED.

DONE and ORDERED.

---

**3.** The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) adopted as binding precedent the decisions of the former Fifth Circuit rendered before October 1, 1981.